2019 IL App (1st) 181564

No. 1-18-1564

Opinion filed on June 28, 2019.

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| CAROLYN ANDERSON, as Independent Administrator of the Estate of Jerome Anderson, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 18 L 1172 |
| CHICAGO TRANSIT AUTHORITY, a Municipal Corporation, | ) ) ) | |
| Defendant-Appellee. | ) ) ) ) | The Honorable John H. Ehrlich, Judge Presiding. |

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1    This case stems from Jerome Anderson's (decedent) fall from a Chicago Transit

Authority (CTA) train platform onto the electrified "third rail," which resulted in his death. His

sister, Carolyn Anderson, was appointed to administer his estate[1] and filed a Wrongful Death Act

(740 ILCS 180/0.01 *et seq*. (West 2016)) and Survival Act (755 ILCS 5/27-6 (West 2016))

lawsuit against the CTA, alleging, in the main, that the CTA failed to properly monitor

---

[1]Decedent is also survived by another sister, brother, two nieces, and a nephew.

decedent's activities on the platform and assess his physical and medical condition while he lingered there for some 30 minutes without ever boarding a train. The CTA filed a motion to dismiss under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2016)) based on the allegations of the complaint and the CTA's attached surveillance video of the platform. The video footage captured decedent's actions before the fall, the fall itself, and the emergency response that followed.[2] The trial court granted the CTA's motion. We affirm.

¶ 2                                        BACKGROUND

¶ 3                              *Plaintiff's Complaint and the Videos*

¶ 4      On June 1, 2017, around 9 a.m., decedent allegedly paid his fare and entered the Kedzie-Homan CTA Blue Line station, allegedly to board a Loop-bound train. The first short video clip shows decedent, who appeared about age 50, walking with a normal gait down the station bridge, toward the CTA platform, where he purportedly intended to board a Loop-bound train. The second and lengthier clip shows that decedent had entered the station's 12-foot-wide platform, flanked on either side by train tracks, with each track maintaining a "third rail" at the outer edge. Once on the platform, decedent stood there about 30 minutes with some 11 trains passing on both sides of the tracks. These trains were bound west toward Forest Park and east toward the Loop (and eventually O'Hare), as passengers gathered and boarded trains without reacting or appearing to notice decedent. Decedent remained mostly in the middle of the platform, sometimes holding onto a pillar and sometimes hunched, along with an episodic stumbling or wobbling observed on the surveillance video.

---

[2]The parties do not dispute that the video footage accurately portrays decedent's condition and conduct while on the CTA platform leading up to his death. In addition, in their briefs the parties relate that decedent was on the platform for some 40 minutes before his death. The stipulated video evidence they provided this court, however, shows decedent was on the platform for about 32 minutes before falling.

¶ 5    On several occasions, he entered the two-foot, blue-colored detectable warning tile, located on both sides of the platform's edge as an apparent measure to remain compliant with the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq.* (2012)). In one instance, for example, decedent stood on the warning tile while a Forest Park train entered the station. Decedent appeared as though he might board the train, although it is not entirely clear that he was actually at the train door, but then decedent hunched slightly and backed away. In another instance, decedent, while standing near the warning tile zone, leaned over but then caught himself and then moved back towards the middle of the platform. Thus, decedent never boarded any CTA train on the morning of his death but rather appeared to be a CTA customer who was weighing whether to enter a train.

¶ 6    During this period of time, it is alleged that several CTA maintenance employees and train operators observed decedent and could have observed his incapacities, although the video depicts no interaction with him. In the first several minutes of decedent's entry on the platform, for example, a CTA custodian walked along the platform, sweeping up debris, but decedent was not even visible to the camera. Decedent later emerged from a middle platform pillar after the custodian had passed by and left, but there is no indication the custodian took any notice of him or interrupted his custodial duties. The operators on the trains that went through the station possibly could have seen decedent, but there is no video proof of that either.

¶ 7    In the final seven minutes before his death, the video shows decedent drinking from a bottle or can which he later dropped to the platform surface. Just then a group of other CTA customers took notice of decedent, looking back at him as they passed by. Several minutes later, decedent then shoved the bottle or can with his foot closer to the warning tile zone. Then, after another few minutes passed, decedent tripped or stepped on the bottle or can, knocking it into the

trackbed before he toppled over the track and landed face down on the third rail, where he was electrocuted. No train was approaching when he fell on the track. Oddly enough, neither party's brief on appeal acknowledges the presence of the bottle or can in the moments leading up to decedent's death, but it is apparent that a combination of decedent's alleged medical condition and his interaction with the bottle or can rather directly led to his unfortunate fall and death.

¶ 8    In the complaint, plaintiff alleged that during decedent's 30 minutes on the platform, he was having a "medical emergency" as a result of his diabetic condition, although plaintiff did not attach any documentation or autopsy reports in support of that allegation. Specifically, it is alleged that he was "in an obvious state of distress due to a diabetic shock," which caused his unusual behavior as noted on the video, prevented him from "standing upright and boarding a train," and led to his fall onto the tracks, where he died.

¶ 9    Accordingly, in filing her complaint, plaintiff claimed wrongful death, common-carrier negligence, alleging that decedent was a CTA passenger to whom the CTA owed the "highest duty of care" and that the CTA negligently failed to fulfill its duty insofar as the employees (1) failed to approach decedent to assess his condition even though he was displaying "clear signs and symptoms" of a "medical emergency," (2) failed to summon medical aid or assistance even in the face of those symptoms, (3) failed to turn off the third-rail electrical power or implement other safety measures "after learning that he was stumbling" on the platform, (4) failed to notify emergency response personnel, (5) failed to adequately monitor the platform, (6) and was otherwise careless and negligent. Plaintiff alleged that decedent's death was a direct and proximate result of negligence by the CTA and its employees.

¶ 10     In addition, plaintiff claimed wrongful death, alleging decedent was a business invitee to whom the CTA owed an ordinary duty of reasonable care but was negligent for the same reasons as set forth for common carriers. Plaintiff also raised these allegations in a Survival Act claim.

¶ 11     It is noteworthy that in plaintiff's complaint, other than the failure to monitor/summon medical aid, there is no allegation that decedent's death was directly caused in whole or in part by the conduct of another person. There is no allegation that he was pushed, pulled, or lured onto the tracks. There is no allegation of a claimed defect on the platform itself that contributed in any way to the events that led to his accidental fall. In fact, the only obstruction on the platform was supplied by decedent himself, when he dropped and then shoved a bottle or can to the platform's edge. Finally, there is no allegation that the CTA failed to warn decedent of the danger of the electrified third rail.

¶ 12                    *Motion to Dismiss and Responsive Pleadings*

¶ 13     As noted, the CTA subsequently filed a section 2-619(a)(9) motion to dismiss plaintiff's complaint, attaching the aforementioned video clips. The CTA argued that it had no legal duty to assess decedent's medical condition, render assistance, or notify emergency personnel, let alone to turn off the third rail of the tracks. The CTA also argued that imposing such a duty would be unduly burdensome given the magnitude of the CTA's operations. In support, the CTA noted that in 2015, CTA trains ran on 224.1 miles of track, making about 2145 trips daily, while servicing 145 stations. The annual ridership had reached 241.7 million, with the total ridership at the Kedzie-Homan Blue Line station being 405,253. The CTA argued that permitting plaintiff's lawsuit would thwart its primary purpose of providing public transportation to Chicagoans.

¶ 14     The CTA also argued that decedent was not a "passenger" because there were "no allegations that [he] was riding, boarding, or alighting a CTA vehicle at the time he sustained

injury," and as such, the CTA did not owe him the "highest duty of care" associated with the common-carrier/passenger special relationship. Plaintiff, in a responsive pleading, insisted that decedent was a passenger and the special relationship between the CTA and decedent required the CTA to protect him from unreasonable risk of physical harm and render first aid after it knew or had reason to know that decedent was ill, as well as to care for him until he could be cared for by others.

¶ 15                    *The Trial Court Judgment*

¶ 16    As will be delineated below in some detail, the trial court ruled that the CTA, although a common carrier, did not owe decedent a duty to protect him from falling onto the tracks. Citing the rule that a contractual relationship between the passenger and common carrier begins when the passenger presents himself at the place of transport with the intent to board, the court found decedent was a passenger. As such, the court concluded that a special relationship of common carrier and passenger existed between the CTA and decedent. In addition, the court found a business invitor-invitee relationship existed. Nonetheless, the court determined a legal duty did not extend from the CTA to protect decedent by specifically monitoring his behavior or attempting to assess whether he required medical attention as he lingered on its platform.

¶ 17    The court analyzed the case from the traditional four-factor duty analysis, first finding that while decedent's medical condition was reasonably foreseeable, his fall onto the electrified third rail from the platform was not. The court wrote, the "tremendously tragic event is simply not the type of injury process the CTA should reasonably foresee as a result of a passenger-invitee suffering an insulin reaction (or any other emergent medical condition)." Second, the court found it was unlikely that one suffering from "an emergent medical event would come into contact with the third rail." Third, and significantly, the court concluded that the magnitude of

guarding against the injury was too great, as the CTA was not duty-bound to intervene, assess, diagnose, or obtain medical assistance for decedent's condition, as that fell within the ambit of first responders and it was unduly burdensome for normal CTA employees. Similarly burdensome was turning off the third-rail's power based on decedent's observable and arguably erratic behavior. Fourth, the court concluded the consequences of placing additional burdens on the CTA were too great, given that a contrary ruling would extend liability to many other public service providers who failed to accurately assess medical conditions and would also interrupt CTA services.

¶ 18    The court therefore held that the duties plaintiff proffered were, as a matter of law, not recognized in Illinois since decedent essentially met his fate as a result of his own medical condition and his odd platform peregrinations and not due to any condition on the platform or as a result of any action by the CTA.

¶ 19    Accordingly, the court granted the CTA's motion to dismiss, and plaintiff appealed.

¶ 20                                              ANALYSIS

¶ 21    Our review of the trial court's granting of a dismissal pursuant to section 2-619(a)(9) is *de novo*. *Smith v. Vanguard Group, Inc.*, 2019 IL 123264, ¶ 9. While a motion to dismiss under section 2-619 admits the legal sufficiency of the plaintiff's complaint, it asserts an affirmative matter that defeats the claim. *Id.* An "affirmative matter" in this instance is something in the nature of a defense that negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994); see also *Jones v. Brown-Marino*, 2017 IL App (1st) 152852, ¶ 20 (noting the purpose of a section 2-619 motion to dismiss is to dispose of issues of law and easily proved issues of fact at the outset of the litigation). As such, when reviewing a

section 2-619 motion, we accept as true all well-pleaded facts, as well as any reasonable inferences from them, but will not accept mere conclusions that are not grounded in the properly pleaded facts. *In re Estate of Alford Shelton*, 2017 IL 121199, ¶ 21; *Downers Grove Associates v. Red Robin International, Inc.*, 151 Ill. App. 3d 310, 315 (1986) (noting a section 2-619(a)(9) motion does not admit conclusions of law, nor does it admit conclusions of fact unsupported by allegations of specific fact upon which such conclusions rest). In addition, we construe all pleadings and supporting documents in favor of the nonmoving party to determine whether the allegations are sufficient to state a claim upon which relief can be granted. *Shelton*, 2017 IL 121199, ¶ 21; *Del Real v. Northeast Illinois Regional Commuter R.R. Corp.*, 404 Ill. App. 3d 65, 70 (2010).

¶ 22    To state a cause of action for negligence, a complaint must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). Also informing the duty inquiry are four policy factors, including the reasonable foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendant. *Id.* at 436.

¶ 23          *Special Duty of Care: The Common Carrier-Passenger Relationship*
                *and Whether a Heightened Duty of Care Applies*

¶ 24    The question of whether defendant owed decedent a duty of care is a legal question also commanding *de novo* review and is an appropriate basis for a section 2-619 motion. *Marshall*, 222 Ill. 2d at 430; *Lang v. Silva*, 306 Ill. App. 3d 960, 970 (1999). It's well established that the touchstone of this court's duty analysis is to ask whether the plaintiff and the defendant stood in

such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *Marshall*, 222 Ill. 2d at 436.

¶ 25    Here, plaintiff maintains the CTA and defendant had the special relationship of common carrier and passenger, such that the CTA maintained a heightened duty of care for the benefit of decedent. The common carrier and passenger is one among four special relationships that section 314A of the Restatement (Second) of Torts identifies, as recognized by our supreme court in *Marshall*, 222 Ill. 2d at 438. Restatement (Second) of Torts § 314A (1965). The others include innkeeper and guest, custodian and ward, and business invitee and business invitor. *Id.* As plaintiff notes, in various instances, such relationships give rise to an affirmative duty to aid or protect another against an unreasonable risk of physical harm and to give first aid to the ill or injured when notified. *Id.*; *Gress v. Lakhani Hospitality, Inc.*, 2018 IL App (1st) 170380, ¶ 16. The duties are premised on a relationship between the parties that is independent of the specific situation giving rise to the harm. *Gress*, 2018 IL App (1st) 170380, ¶ 16. Significantly, the key to imposing a duty based on a special relationship is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm. *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120951, ¶ 39.

¶ 26    This court has long held that a common carrier has a duty to its passengers to exercise the highest degree of care, not only to carry them safely to their destinations, but to provide them with a reasonable opportunity to board and leave the conveyance safely. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010); *Katamay v. Chicago Transit Authority*, 53 Ill. 2d 27, 32 (1972). Whether the uncontroverted facts establish the relationship of carrier and passenger is a question of law for the court to determine. *Eskew v. Burlington Northern & Santa Fe Ry. Co.*, 2011 IL App (1st) 093450, ¶ 33. Yet, as the parties' arguments reveal, exactly when

a person becomes or ceases to become a passenger on a common carrier is not clearly defined under the law and depends on varying circumstances. See *Jones v. Chicago & Northwestern Transportation Co.*, 206 Ill. App. 3d 136, 138 (1990).

¶ 27    Plaintiff now argues that a CTA customer becomes a passenger when he pays his fare, then enters some place under the carrier's control, such as a station waiting room or platform, and once there, intends to be transported. See *Skelton v. Chicago Transit Authority*, 214 Ill. App. 3d 554, 572-73 (1991). Plaintiff maintains decedent satisfied that test. The CTA counters that to be a passenger, one must be in the act of boarding, be upon, or be in the act of alighting from the carrier's vehicle. See Illinois Pattern Jury Instructions, Civil, Nos. 100.09, 100.10 (approved July 18, 2014) (similarly defining passenger); *Del Real*, 404 Ill. App. 3d at 72. As decedent was doing none of those things, the CTA asserts he failed to meet the legal definition of passenger, and thus there was no higher duty of care. We agree with the CTA.

¶ 28    These competing legal propositions are set forth in *Katamay*, 53 Ill. 2d 27, the supreme court's seminal case about who qualifies as a "passenger" for the purposes of imposing the heightened duty of care. In *Katamay*, the plaintiff approached an opened-door train that had stopped, and as she did so, fell on the platform because the heels of her shoes had wedged between spaces in the wooden planks, leading to her injury. The supreme court concluded that, as a matter of law, the plaintiff was a passenger at the time of her injury and, as such, the CTA owed her the highest degree of care. The court noted,

> "the rationale for the imposition of the duty upon a carrier to exercise the highest degree
> of care for the safety of an individual while he is a passenger as distinguished from the
> lesser duty owed at all other times is that the degree of care should be commensurate with

the danger to which the passenger is subjected, and the degree of care required to be exercised increases as the danger increases." *Id.* at 29-30.

¶ 29    *Katamay* discussed with approval three prior Illinois cases involving passengers who were injured when alighting from or while boarding trains and one Washington state case involving a passenger injured while waiting to purchase his ticket on the ferry dock.[3] The supreme court then held the plaintiff "was not required to be in physical contact with defendant's train in order to occupy the status of passenger" if she intended to board the train, pay the required fare, and moved toward it for that purpose. *Id.* at 32. The fact that she was standing on the boarding platform and was "engaged in the 'act of boarding' " meant that the CTA owed her "the duty to exercise a degree of care for her safety equal to the duty owed to provide her a safe place to alight," which was the highest degree of care. *Id.* This was notwithstanding that plaintiff had not actually boarded the train at the time of her injury.

------------------------

[3]*Katamay* specifically noted that *Zorotovich v. Washington Toll Bridge Authority*, 491 P.2d 1295 (Wash. 1971), involving the ferry passenger, identified several factors for determining a person's status, including the place under the carrier's control for use by people about to enter the conveyance, the time to enter the conveyance, the person's intention to enter the conveyance, a person's submission to the carrier's control, and knowledge by the carrier that the person is prepared to take passage or persons awaiting passage are reasonably there. *Katamay* further noted *Zorotovich*'s statement that its result did not change even though the plaintiff in that case was not actually in the act of boarding the ferry when injured and that the dock was several hundred feet in length, since " 'the dock was a necessary part of the act of boarding the ferry.' " *Katamay*, 53 Ill. 2d at 32 (quoting *Zorotovich*, 491 P.2d at 1298). *Katamay* also specifically identified *Lake Street Elevated R.R. Co. v. Burgess*, 200 Ill. 628, 629 (1903), where the plaintiff had alighted from one train onto an "island platform" and was in the process of boarding a connecting train when she was injured. *Katamay* noted *Burgess*' reliance on *Chicago & Eastern Illinois R.R. Co. v. Jennings*, 190 Ill. 478 (1901) (a case we discuss at length later), holding that if a person is in the place for passengers, such as a station platform, with a ticket and intending to take a conveyance, that person has the right of a passenger. *Katamay* used both these cases and the others to justify its holding that one need not be in *actual contact* with the train in order to be a passenger but must be moving toward it for that purpose. While some might interpret *Katamay*'s reliance on those cases as justifying the conclusion that anytime a person is on a train platform, he is a passenger, we think *Katamay* only demonstrates that the analysis for determining who is a passenger is much more nuanced. Also contradicting any such conclusion is the fact that the cases *Katamay* relied upon primarily all involved a passenger alighting or boarding a train and not simply remaining on the platform. Regardless of the cases relied on, *Katamay*'s principal holding remains more narrow.

¶ 30    Applying the rules stated in *Katamay* to the case at bar, we conclude that decedent was not a passenger at the time of his accident. Even taking the plaintiff's allegations as true that decedent paid his fare and entered the station platform intending to board the train, decedent then lingered on the platform for some 30 minutes without boarding any of the 11 trains that entered the station. After wandering around the platform and loitering in particular spots, decedent tripped on a container that he had moments before dropped on the ground, prompting his stumble and fall from the platform to the third rail. The video evidence submitted thus defeats plaintiff's legal and factual assertions in her complaint, and plaintiff did not counter that evidence. See *Doe v. University of Chicago Medical Center*, 2015 IL App (1st) 133735, ¶ 42 (if the movant puts forth sufficient evidence to entitle it to judgment as a matter of law, the burden shifts to the nonmovant to counter that evidence). As described in further depth below, whether decedent's claimed medical emergency also contributed to his fall did not convert him to a CTA passenger. See *Fillpot v. Midway Airlines, Inc.*, 261 Ill. App. 3d 237, 243 (1994) ("the defendant's duty of highest care applies when passengers entrust the common carrier to protect them from dangers to which they may not otherwise have been exposed and from which they cannot otherwise protect themselves"); *cf. Katamay*, 53 Ill. 2d at 31-32 (noting factors for determining passenger status). Unlike in *Katamay*, in this case decedent was not at all engaged in the act of boarding the train, as there was no train even in sight at the time of his accidental fall. He thus was by no means a passenger to whom the CTA owed a heightened duty of care.

¶ 31    In reaching this conclusion, we disagree with plaintiff's reliance on *Skelton*, where the plaintiff and his girlfriend entered the Oak Park station intending to pay their fare when they boarded, and both waited on the platform for the train. On seeing it, plaintiff stood on the platform edge, waving at the train before losing his balance and falling onto the tracks, where he

was injured by an oncoming train. Although there was some evidence that plaintiff had been drinking alcohol and was half asleep when he fell off the track, *Skelton* concluded the defendant had placed himself at the proper place to be transported with the intention of becoming a passenger and was thus a passenger at the time of his injury. Thus, the CTA, as a matter of law, owed plaintiff the highest duty of care in his action for negligent operation of the train.

¶ 32     *Skelton*, even at first glance, is distinguishable from this case since there the plaintiff was at least waving at a train he intended to board and was struck by it. Even apart from that fact, we find *Skelton* of questionable value since the acts of waving at a train or being half-asleep and falling off the track are not ones that an individual takes to board a train or submit to the carrier's control. Such actions also do not show an acceptance by the carrier of a person as a passenger. See *Todd v. Louisville & Nashville R.R. Co.*, 274 Ill. 201, 208 (1916) (where train was moving at the time the decedent tried to get on, the employees "in charge of the train never assented, either directly or impliedly, to his becoming a passenger on the train"). Likewise, we find *Skelton*'s holding—that the plaintiff's presence on the platform, together with intent to board, was enough to make him a passenger—misplaced.

¶ 33     This is because to reach that conclusion, *Skelton* relied on a factually inapposite, although still vibrant, 1901 supreme court case, *Chicago & Eastern Illinois R.R. Co. v. Jennings*, 190 Ill. 478 (1901). There, the plaintiff's decedent was killed when he crossed the railroad tracks while on his way to the train depot. *Jennings* noted that the high duty of care on the part of the common carrier arises "when the contract relation begins" and if the plaintiff-decedent is "at the place provided for passengers, such as [a] waiting room or platform at the station, with the intention of taking passage and has a ticket, he is entitled to all the rights and privileges of a passenger." *Id.* at 483. Significantly, the court went on to state that such a person must have

placed himself "under the control of a carrier in order to be entitled to its care as a passenger," as the mere fact of having a ticket or intending to take the train does not suffice. *Id.* at 484. *Jennings* wrote that the relationship is often understood by implication, where "one has offered himself to be carried, and that the offer has been accepted by the carrier." *Id.* at 485. Given that the decedent was crossing the railroad tracks and had not reached any place provided for passengers, *Jennings* held that he was not a passenger, and thus no high duty of care existed, but rather an ordinary one.

¶ 34    *Jennings* and its progeny rightly stand for the proposition that a person cannot be a passenger to whom the carrier owes a high duty of care when they are not even on the common carrier's premises. See, *e.g.*, *Pence v. Northeast Illinois Regional Commuter R.R. Corp.*, 398 Ill. App. 3d 13, 18 (2010) (noting the plaintiff injured in middle of a public roadway of the Metra track system was not a passenger); *Del Real*, 404 Ill. App. 3d at 73 (noting the plaintiff who only attempted to board the platform was not a passenger). *Skelton*, however, seems to gloss over that factual distinction. Moreover, as delineated above, this case presents a different factual scenario.

¶ 35    Having reviewed the cases and parties' arguments, we conclude that mere presence on a CTA platform, followed by an accidental death on the train tracks possibly from a medically-induced condition, without more, does not garner the injured person the status of a "passenger" to whom the CTA owes the highest duty of care, notwithstanding that the injured person paid his fare and at one point had intentions of boarding a train. *Katamay* and other Illinois common-carrier cases, dealing with third-party attacks on the platforms, support this conclusion. For example, in *Neering v. Illinois Central R.R. Co.*, 383 Ill. 366 (1943), the plaintiff was assaulted on the station platform while awaiting the arrival of a train and subsequently sued the railroad company. The supreme court noted the question on appeal was whether the railroad company

had provided sufficient protection for its passengers at its station platform to prevent them from being assaulted. The court noted the parties had conceded that plaintiff "was a passenger after arriving on the station platform" but that the railroad nonetheless only owed her "the duty of ordinary care." *Id.* at 374. The court wrote that, instead,

> "[t]he rule requiring the highest degree of care on the part of railroad companies for the protection of passengers applies *only to the operation of trains and immediate incidents of transportation*, and as to station buildings and other appurtenances the carrier is required to exercise only ordinary care to keep them in reasonably safe condition for use."[4] (Emphasis added.) *Id.*

See also *Hopkinson v. Chicago Transit Authority*, 211 Ill. App. 3d 825, 838-41 (1991). It has also been said that a common carrier must "exercise with regard to its passengers the highest degree of care *consistent with its mode of conveyance and practical operation*." (Emphasis added.) *Loring v. Yellow Cab Co.*, 33 Ill. App. 3d 154, 157 (1975); see also *Krywin*, 238 Ill. 2d at 227 (same).

¶ 36    Returning to the case at bar, there were no trains or "immediate incidents of transportation" that should have warranted the higher duty of care. See *Neering*, 383 Ill. at 374; see also *Roth v. Costa*, 272 Ill. App. 3d 594, 596 (1995) ("Although a carrier owes a high degree of care when actually transporting its passengers, it owes only ordinary, reasonable care to

---

[4]Since *Neering*, the legislature passed the Metropolitan Transit Authority Act, which controls the CTA's powers and responsibilities. 70 ILCS 3605/1 *et seq.* (West 2016). Section 27 provides that the CTA board may appoint a police force to aid the municipal force to protect CTA property, passengers, and employees. Perhaps recognizing the impracticality of protecting against all crime, the legislature also thought to immunize the CTA from lawsuits for third-party crimes: "Neither the [CTA], the members of its Board nor its officers or employees shall be held liable for failure to provide a security or police force or, if a security or police force is provided, for failure to provide adequate police protection or security, failure to prevent the commission of crimes by fellow passengers or other third persons or for the failure to apprehend criminals." 70 ILCS 3605/27 (West 2016).

passengers in its stations and on its platforms."); *Jones*, 206 Ill. App. 3d at 138 (noting "it is well established that once a passenger has safely alighted from a train, the only duty a carrier owes a passenger that debarked from the train is the duty of ordinary care"); *cf. Aliotta v. National R.R. Passenger Corp.*, 315 F.3d 756, 768 (7th Cir. 2003) ("At least when they are victims of accidents which involve the trains themselves, persons who are on the platform with intent to board a train are passengers ***."). Nor would the high duty of care plaintiff wishes us to adopt be reasonably consistent with the CTA's "mode of conveyance and practical operation." See *Loring*, 33 Ill. App. 3d at 157; see also *Krywin*, 238 Ill. 2d at 227.

¶ 37     Our holding is consistent with the policy reasons behind the high duty of care between a common carrier and passenger. Indeed, the common carrier has the most control, and thus is in the best position to protect against the risk of harm, when the carrier is about to transport or is in the process of actively transporting a passenger. See *Krywin v. Chicago Transit Authority*, 391 Ill. App. 3d 663, 668 (2009), *aff'd*, 238 Ill. 2d 215 (2010) ("passengers must wholly rely upon a common carrier's proper maintenance and safe operation of its equipment during passage"). As expressed in *Davis v. South Side Elevated R.R. Co.*, 292 Ill. 378, 381-82 (1920), where the court held that only an ordinary duty of care was owed to a plaintiff who was injured after slipping and falling on a banana peel left on the landing of the station stairs:

> " 'A railroad company is held to the highest degree of care in respect to the condition and management of its engines and cars, because negligence in that respect involves extreme peril to passengers, against which they cannot protect themselves. It would not act reasonably if it did not exercise greater care in equipping and running its trains than in regard to the condition of its station grounds.' " *Id.* (quoting *Moreland v. Boston & Providence R.R. Co.*, 6 N.E. 225, 227 (Mass. 1886)).

¶ 38    In addition to these precedents, section 314 of the Restatement (Second) of Torts, which details the duties owed by a common carrier to its passengers, supports our holding. Although plaintiff asserts comment *d* to section 314A and the illustrations favor her legal position regarding decedent's status as a passenger, we find quite the contrary. See Restatement (Second) of Torts § 314A cmt. d, at 119-20 (1965). A brief analysis proves that plaintiff's position here is quite a misstatement of the Restatement (Second) of Torts. That is because the illustrations noted in the Restatement (Second) of Torts all describe injuries to *passengers on a train*. In illustration 1, for example, a passenger on the train of the defendant railroad falls off the train and is injured; the crew discovers that he has fallen, but they do nothing to aid him. See Restatement (Second) of Torts § 314A illus. 1, at 120 (1965). In illustration 2, a "passenger riding on the train *** suffers an apoplectic stroke and becomes unconscious. The train crew unreasonably assume that [he] is drunk, and do nothing to obtain medical assistance for him,' " which leads to an aggravation of his illness over five hours. Restatement (Second) of Torts § 314A illus. 2, at 120-21 (1965). As the reader can see, these illustrations are in no way similar to the factual situation in the case *sub judice*. As stated, decedent was not on the train and did not fall from the train.

¶ 39    Last, there is no competent evidence the CTA had constructive or actual notice of decedent being in the midst of a medical emergency. A common carrier is not liable when he lacks knowledge of an unreasonable risk, illness, or injury. Restatement (Second) of Torts § 314A cmt. e, at 119 (1965). By contrast, "[w]hen a common carrier knows that a passenger is affected by a physical or mental disability which increases the hazards of travel, a degree of attention should be bestowed on their safety beyond that due to an ordinary passenger." 7 Ill. L. & Prac. *Carriers* § 263, at 67 (updated 2018). In a somewhat analogous fashion, common carriers owe "helplessly intoxicated" passengers a high duty of care, although not a duty of

continuous monitoring, once the carrier *knows* of the intoxication. See *Panor v. Northwestern Elevated R.R. Co.*, 228 Ill. App. 162, 175, 180 (1923) (applying highest duty of care where "the servants of a carrier put a helplessly intoxicated passenger off on a dangerous platform, with knowledge of his condition," then left him "without further care" such that he was injured); but see *St. Louis, Alton & Terre Haute R.R. Co. v. Carr*, 47 Ill. App. 353, 358 (1892) ("If a passenger voluntarily becomes intoxicated, the law does not impose the duty on the common carrier to place a guard over such passenger to prevent him from injuring himself, or placing himself in a place of danger.").

¶ 40     Apart from the fact that the decedent here was not a passenger, the video itself contradicts plaintiff's allegation that CTA employees even observed decedent or his alleged aberrant activities. See *Gaines v. Chicago Transit Authority*, 346 Ill. App. 3d 346, 349 (2004) (a carrier is not liable for injuries that result from a cause beyond its control); *cf. Suarez v. Trans World Airlines, Inc.*, 498 F.2d 612, 613-17 (7th Cir. 1974) (airline owed highest duty of care to passenger with prepaid ticket who had informed airline of her disabled condition, and requested a wheelchair, but was then left in the lobby for two hours and suffered a heart attack). It also contradicts plaintiff's allegation that decedent was displaying clear signs and symptoms of a medical emergency because not only did 11 trains pass by decedent without the train operators having any responsive action but so too did a number of passengers. And, indeed, there is no reason why anyone should have taken note of decedent's somewhat erratic activity. To state the obvious, the bus stations and train platforms of Chicago have plenty of people who are not acting in an entirely normal way, so decedent's behavior, even if specifically observed, would not look that out-of-place at an "L" station. Even considered with the improved vision of hindsight, the

decedent gave all appearances of nothing more than a commonly observed mass transit platform habitué.

¶ 41    *Special Duty of Care: The Business Invitor-Invitee Relationship*

*and Whether an Ordinary Duty of Care Applies*

¶ 42    Having found decedent was not a train passenger but merely a CTA customer lingering on the platform, we turn to the next stage of our analysis. The parties agree that decedent was a business invitee and the CTA was a business invitor, which by itself only gives rise to an ordinary, reasonable duty of care. See *Marshall*, 222 Ill. 2d at 437; *Roth*, 272 Ill. App. 3d at 596; see also *Davis*, 292 Ill. at 381 (noting there was no reason to hold a railroad company to "a higher degree of care in maintaining its station buildings than that to which an individual owner of buildings used for ordinary business purposes is held"). It is worth noting that although both the special relationships of carrier-passenger and business invitor-invitee generally give rise to an affirmative duty to aid or protect another against unreasonable risk of physical harm and to render care to the ill or injured, case law dictates that the carrier-passenger relationship garners a higher duty of care than does the business invitor-invitee. See *Marshall*, 222 Ill. 2d at 438-39; Restatement (Second) of Torts § 314A (1965).

¶ 43    With respect to the business invitor-invitee relationship, we find *Parra v. Tarasco, Inc.*, 230 Ill. App. 3d 819, 822 (1992), instructive. There, the plaintiff estate of the decedent filed a wrongful death negligence suit after the decedent died when he choked on a piece of food in the defendant's restaurant. It was undisputed that the choking was not due to a foreign substance in the food or food poisoning. The plaintiff nonetheless alleged the defendant restaurant was negligent, in part, for failing to post conspicuous instructions for patrons and employees regarding first-aid assistance to choking patrons and the restaurant further failed to assist

decedent when he was choking or summon prompt medical aid. This court recognized the invitor-invitee special relationship warranted an ordinary duty of care on the defendant's part but nonetheless held that there was no duty "on a restaurateur to rescue a customer from a danger which was not caused in the first instance by the restaurateur." *Id.* at 822. Instead, the court wrote that the cause of the injury was "wholly idiopathic, *i.e.*, it is of an internal, personal origin." *Id. Parra* reasoned that a restaurateur is not an insurer of his customers' safety against all personal injuries, nor does he have a duty as to conditions or risks that are ordinary and are, or should be, known or obvious to the patron. Under *Parra*, an invitor's ordinary duty is not broad enough to require the invitor to aid a customer suffering from a natural cause that is not attributable to the invitor.

¶ 44     Here, plaintiff similarly argues that the CTA has the duty to "monitor" the platform for anyone acting in a manner that might suggest a medical problem or the need for a referral to medical personnel. This monitoring duty, plaintiff argues, would extend to any CTA employees who had the opportunity to observe decedent while he was lingering by himself on the platform for about 30 minutes. Plaintiff also suggests that the monitoring should include having somebody monitor the video camera feed (presumably in real time) to look out for disturbed or disoriented individuals.

¶ 45     We find, as in *Parra*, that plaintiff has not cited any Illinois case law providing that the CTA's ordinary duty toward invitees requires its employees to monitor the station platforms to determine whether plaintiff was in the throes of a medical problem requiring attention or to intervene and rescue a customer from a wholly idiopathic illness. Plaintiff has not identified any Illinois cases elevating the CTA's duty as an invitor to such a degree that it could be expected to execute a carrier's version of emergency triage. It is noteworthy that plaintiff has asserted a

conclusory allegation of medical emergency without identifying what causes diabetic shock, how it can be identified, or how it can be treated. Given that it is the crux of her lawsuit, we do not believe it is a well-pled allegation, nor has plaintiff provided any medical documents to corroborate the allegation in the face of the motion to dismiss.

¶ 46    Bluntly put, the CTA is not an insurer of the safety of every individual customer and passenger but is focused on ensuring mass transit for the public at large. *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230, 243 (1988). The CTA was not in the best position to monitor and maintain decedent's health. The decedent was. As in *Parra*, the CTA does not have a duty to scan its platforms for conditions or risks which are, or should be, known or obvious to the customer. This includes individual medical maladies and not standing so near the edge of a platform over train tracks when feeling ill. See *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶¶ 31-32 (in Illinois, falling from a height is considered an obvious danger, as is a moving train, and there can be no recovery for injuries caused by a danger found to be obvious). In short, we find the ordinary duty of care the CTA owes to its customers and passengers does not encompass the allegations in plaintiff's complaint.

¶ 47    In reaching this decision, we recognize that Illinois's treatment of certain special relationships, as compared with the Restatement, presents an anomaly. The Restatement's section 314A, does not assign different levels of duty to the four special relationships identified therein. Instead, that section requires only the exercise of reasonable care under the circumstances and applies "where the relation exists between the parties, and the risk of harm, or of further harm, arises in the course of that relation." Restatement (Second) of Torts § 314 cmt. c, e, at 119 (1965). Additionally, comment *d* clarifies that the duty to give aid to an ill or injured person extends to cases involving natural causes and pure accident, such as the case alleged at

hand. *Id.* However, under Illinois case law, the CTA would have a heightened duty of care toward decedent only if he were a passenger.[5]

¶ 48    The Restatement and Illinois case law do not explain the different levels of duty assigned nor what they entail on a practical level. It seems, however, that "heightened duty" means that the ordinary duty owed in every special relationship case may be broader in certain circumstances, providing a plaintiff more ways to allege that a legal duty was triggered. See *Danile v. Oak Park Arms Hotel, Inc.*, 55 Ill. App. 2d 2, 9 (1964) (an innkeeper-guest case noting "a reasonable degree of care is a high degree of care"). Additionally, we note that the high standard due to a carrier is a holdover legal principle that derives from English and early American common law, developed in particular during the Industrial Revolution. See Robert J. Kaczorowski, *The Common-Law Background of Nineteenth-Century Tort Law*, 51 Ohio St. L.J. 1127, 1158 (1990). As one early Connecticut court wrote, the reason for this high standard is that the carrier "has, for the time being, committed to his trust the safety and lives of people, old and young, women and children, locked up, as it were, in the coach or rail-car, ignorant, helpless, and having no eyes, or ears, or power to guard against danger, and who look to him for safety in their transportation" such that "as far as human foresight and care can reasonably go, he will transport them safely." *Dewort v. Loomer*, 21 Conn. 245, 253-54 (1851). In such cases, the common carrier "is liable for the smallest negligence in himself or his driver." *Id.* at 254; see also *Stokes v. Saltonstall*, 38 U.S. (1 How.) 181, 190-91 (1839) (requiring the stage coach driver to act with "the utmost prudence and caution" and "if the disaster in question was occasioned by the least negligence, or want of skill, or prudence on his part, then the defendant is liable in this action").

---

[5]The heightened duty of care also applies to the special relationship of innkeeper-guest. See *Gress*, 2018 IL App (1st) 170380, ¶ 16.

¶ 49    Thus, the heightened or broadened duty seems to apply to situations where the defendant, like the common carrier or innkeeper, has a greater degree of control over the plaintiff passenger or guest. However, as set forth in this case, the CTA owes decedent no heightened duty because he was not a passenger, and the CTA lacked knowledge of his condition. Under *Parra*, the CTA also does not owe any duty to aid in these circumstances, notwithstanding the business invitor-invitee special relationship. Plaintiff therefore failed to establish a legal duty.

¶ 50             *Policy Considerations and the Legal Burden on the CTA*

¶ 51    Even assuming a duty of reasonable care (or even the highest degree of care, in our judgment), plaintiff's suit still cannot proceed because requiring the CTA to perform a layman's triage to sort out an emergent medical condition would be entirely unreasonable and impractical, negating the existence of a legal duty. See *Krywin*, 238 Ill. 2d at 232-33. In other words, the factors relied on by the CTA support the creation of an exemption from that duty. See *Marshall*, 222 Ill. 2d at 437.

¶ 52    The courts and legislature have recognized that the continued operation of the CTA is essential for the Chicago metropolitan area. *Bilyk*, 125 Ill. 2d at 238. As the CTA noted in its motion to dismiss, this court may take judicial notice of the magnitude of the CTA's operations. *Joseph v. Chicago Transit Authority*, 306 Ill. App. 3d 927, 936 (1999). In its motion, the CTA noted that in 2015, CTA trains ran on 224.1 miles of track, they made about 2145 trips daily, and the CTA serviced 145 stations. The annual ridership had reached 241.7 million, with the total ridership at the Kedzie-Homan Blue Line station being 405,253.

¶ 53    In a city as large as Chicago with its plethora of trains, buses, and customers and passengers, it is simply infeasible for the CTA to hire people who could make a differential diagnosis on the bus stop or train platform. A CTA maintenance worker or train operator surely

has some skills for their position, but they do not include acting as a first responder or a paramedic. Decedent, after all, was standing and/or ambulating on a train platform, not in a hospital emergency room waiting area. The type of monitoring plaintiff suggests could also lead to undue delays should the CTA be required to turn off the third rail anytime a customer acted in an aberrant way. Additionally, plaintiff's suggestion that these practices are forms of protection delineated in the Restatement's section 314A(1)(a), is quintessential, legal hyperbole that is not rooted to the factual or legal situation with which we are confronted. That is, section 314A is grounded in reasonableness; plaintiff's position is not. Likewise, enlarging duty to encompass the situation presented in this case could expose the CTA to liability for a customer's mental health problems and other medical problems not of the CTA's own making. This would undercut the mass transit legislative purpose of the CTA by diverting public funds to guard against these lawsuits.

¶ 54     Therefore, even assuming a medical condition and injury like that present in this case were reasonably foreseeable and likely to cause injury or death of a customer or passenger on a CTA platform, we conclude the magnitude of the burden of guarding against the injury and the consequences of placing that burden on the CTA would be too great. See *Krywin*, 238 Ill. 2d at 234-35; *Serritos v. Chicago Transit Authority*, 153 Ill. App. 3d 265, 271-72 (1987).

¶ 55                                    CONCLUSION

¶ 56     For the reasons to follow, we conclude there was no legal duty owed by the CTA to decedent. As such, we affirm the judgment of the circuit court dismissing plaintiff's lawsuit.

¶ 57     Affirmed.