## Pauline Panor, Administratrix, Appellee, v. Northwestern Elevated Railroad Company, Appellant.

### Gen. No. 27,284.

1. Carriers—*negligence as to intoxicated passengers.* An elevated railroad company is answerable in damages for the act of a trainman in leaving plaintiff's intestate off on a narrow platform between two tracks which were in frequent use, without care for his safety, where the evidence shows that such intestate was a passenger on defendant's train, and that it was necessary for him to transfer at the platform in question, that he was so helplessly intoxicated that he was unable to alight without assistance from the trainman, that the latter helped him off the car onto the platform, knowing he was too drunk to stand or walk alone and that there was no guard on the platform, but made no effort to assist him to a place of safety or otherwise care for him, and that as a result of his helpless condition such passenger fell from the platform in front of a moving train and was killed, especially where the company has a rule which requires trainmen and employees to assist passengers in such condition to a place of safety.

2. Carriers—*pleading carrier's negligence in failing to care for*

Panor v. Northwestern Elevated Railroad Co., 228 Ill. App. 162.

*helplessly intoxicated passenger.* A declaration which charges defendant carrier with negligence in leaving a helplessly intoxicated passenger off its train on a narrow platform between two much-used tracks in a place of danger without any care for his safety is not insufficient in failing to charge that defendant's actions, which contributed to the resultant injuries and death, were wilfully or wantonly negligent.

3. CARRIERS—*necessity for alleging due care of helplessly intoxicated passenger.* An allegation that plaintiff's intestate was in the exercise of due care at the time of the negligence of defendant complained of is not necessary in a declaration charging the defendant carrier with negligence in leaving such decedent off on a narrow "island" platform between two much-used tracks, without any care for his safety, where the other allegations set up complete helplessness of such decedent as a result of voluntary intoxication and that his condition and danger were known to defendant's trainman who put him off the train at such place of danger.

4. CARRIERS—*instruction limiting liability to negligence charged in declaration as error.* In an action for damages for the death of plaintiff's intestate in putting him off its train at a transfer point on a narrow dangerous platform when he was helplessly intoxicated, without taking any care for his safety, an instruction which states the duty of defendant carrier in such case and limits its liability to the negligence charged in the declaration is not erroneous.

5. CARRIERS—*degree of care as to helplessly intoxicated passengers.* An instruction which held defendant carrier to the duty of exercising toward decedent the highest degree of care consistent with the practical operation of the railroad is not erroneous where the evidence shows that plaintiff's decedent was so intoxicated as to be completely helpless to care for himself and that his condition was obvious and was known to defendant's trainman, that the latter put him off the train on a narrow platform in a place of great danger without any care for his safety and that he fell from the platform in front of a moving train and was killed.

6. CARRIERS—*concurrent negligence of third person as defense.* A carrier is not relieved from liability for the negligence of its trainman in leaving a helplessly intoxicated passenger off on a narrow platform between two much-used tracks in a place of danger, without any care for his safety, by the fact that a fellow-passenger tried to help such drunken passenger to an apparently safe place and there left him while he himself went to board another train, where the trainman's negligence was the efficient cause of such drunken passenger's death after he had fallen from the place in which the fellow-passenger had placed him; and it is not error to refuse an instruction making the fellow-passenger's acts the proximate cause of death.

7. CARRIERS—*negligence of carrier as question of fact.* A directed verdict for defendant carrier was properly denied in an action for damages for the death of plaintiff's intestate where the evidence showed that such intestate was a passenger on defendant's train, that he was helplessly intoxicated and unable to care for himself, that such condition was known to the trainman in charge of the car in which he was riding, that when he reached his transfer point he was unable to alight from the car without assistance and that the trainman pushed him off the car onto a narrow unrailed platform between two much-used tracks and left him there without any care for his safety and that such passenger fell from the platform in front of a moving train and was fatally injured.

Appeal by defendant from the Superior Court of Cook county; the Hon. OSCAR HEBEL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Affirmed. Opinion filed February 16, 1923. *Certiorari* denied by Supreme Court (making opinion final).

ADDISON L. GARDNER and CARROLL H. JONES, for appellant.

HENRY R. RATHBONE and H. A. BARNHARDT, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

The plaintiff, Pauline Panor, administratrix of the estate of Myer Panor, brought suit in the superior court against the defendant, Northwestern Elevated Railroad Company, to recover damages for the death of Myer Panor, her husband, who, on the evening of September 9, 1919, at the Belmont avenue station of the defendant's elevated railroad, fell from the station platform to the track in front of an approaching train and was struck and killed.

The declaration of the plaintiff was filed on October 16, 1919, and consists of one count. It alleges that on September 9, 1919, the defendant was operating a system of elevated railroads and trains for the carriage and convenience of passengers for hire in the City of Chicago; that on the evening of that day the plaintiff's

intestate, Myer Panor, became a passenger in one of the defendant's northbound trains; that some miles in a northerly direction from the loop there was a junction of two branches of the railroad at or near a certain station known as the Belmont avenue station; that the defendant maintained there a certain narrow platform of several feet in length; that a certain stairway led up into the middle of the platform, the sides of which stairway were banistered, and along the platform by the opening to the stairway there were certain banisters or boarded up sides which were very near the edges of the platform along which the defendant's trains passed; that the space upon the platform between the boarded up sides at the top of the stairway and the edge of the platform where the trains passed along was very narrow, to wit, $3\frac{1}{2}$ feet wide, and that the platform was about $4\frac{1}{2}$ feet higher than the railroad tracks upon which the trains ran and had no railing nor other protection of any kind along the edge of the platform where the trains passed along, and that the train upon which the plaintiff was a passenger necessarily passed over the tracks and very close to the platform; that when Myer Panor was a passenger on the defendant's train he was greatly intoxicated, so much so that he was in a helpless condition and was incapable of exercising any care of judgment for his own safety, which was well known to the servants of the defendant in charge of the train; that it then and there became and was the duty of the defendant, by its servants, to use the highest degree of care, consistent with the practical operation of their railroad in view of the mode of conveyance adopted, for the safety of Myer Panor, but notwithstanding its duty in that behalf the defendant negligently and carelessly put Myer Panor off onto the platform at the Belmont avenue station and left him there without anyone to look after him or care for him, and knowing that many of the defendant's trains would necessarily

pass along the tracks in close proximity to the platform, and knowing, or by the exercise of ordinary care should have known, that Myer Panor was in danger, in his then condition, of falling from the platform and being injured or killed by one of the defendant's trains; that shortly after the defendant put Myer Panor onto the platform, he did fall off the platform immediately in front of one of the defendant's oncoming trains and received personal injuries from which he immediately thereafter died; that he left him surviving, Pauline Panor, his wife, and no children. The *ad damnum* is $10,000. The defendant pleaded the general issue.

Upon the trial of the cause the evidence showed substantially the following: Panor, thirty-six years of age, was a salesman employed at 205 South State street and at about six o'clock on the evening of September 9, 1919, left his place of employment to go to his home at 1303 Roscoe street, where there was an elevated station of the defendant on its Ravenswood branch. That was the station where he took the elevated to go down town and where he got off at night, when he went home. To reach that station from down town, if he got on any other than a Ravenswood train, he had to change cars at Belmont avenue. On the night in question he boarded a northbound Evanston express train, presumably to go home. The evidence does not show at what station he boarded the train. No witness testified to having seen him in a car of that train before it reached Madison street and Wabash avenue.

According to the testimony of Hazel Marlatt, the witness who first saw him, it was about 8:20 p. m. She worked at the Stevens Building and boarded the train in question at Madison street and sat close to the rear door on the west side of the car. When she entered the car and sat down she saw Panor sitting in the rear on the east side, right across from her. She knew him by sight, and had met him before but

did not speak to him while on the train. She says he sat all stooped over as though he were drunk, with his head down, and kept bobbing in and out of the window as the train was moving along all the way to Belmont avenue. As the train approached Belmont avenue the guard called out the station and after the train stopped Panor got up and got off on the station platform. According to Miss Marlett he got up and staggered to the door and the guard took his hand and, as the train started to go, pushed him back from the train.

The witness for the plaintiff, MacDonald, a pharmacist's mate in the United States Navy, who got on the same train at Adams street and Wabash avenue, and entered the front end of what he thought was the next to the last car of the train and remained standing on the front platform of the car all the way to Belmont avenue, testified that he did not see Panor board the train and did not see him at any time until the train reached the Belmont avenue station. The evidence shows that the trainmen on guard at the gates of the car platforms remained out on the car platforms during the entire trip from Adams and Wabash to Belmont. As the train approached the Belmont avenue station the guard called out in both cars, "Belmont avenue change for Ravenswood and other locals." The first time MacDonald saw Panor that evening was when there was a commotion behind him as he, MacDonald, was starting to get off the car at Belmont avenue after the train had come to a stop. He turned around to his right, when he heard the commotion, to see what it was about and saw the guard had hold of Panor's right arm and seemed to be holding him up. MacDonald then turned around and took hold of Panor's other arm and helped him off the train, getting off himself first. MacDonald said that Panor seemed to have "a bleary, stupid look. * * * His breath was alcoholic and fetid. * * * I did not notice that he talked any

at all. He just simply mumbled." When Panor and MacDonald got on the platform, Panor staggered back to the east and pulled MacDonald along with him and the guard reached over and pushed Panor away from the train. MacDonald had hold of him by the left arm at that time. MacDonald says the guard said, "Go away, you G— damned stew bum." The gate was then closed and the train had started. Immediately afterwards, on the platform, MacDonald slackened his hold of Panor and the latter staggered around, and he just barely saved Panor from falling in front of a Wilson avenue express which came along at that time. MacDonald noticed Panor was very much intoxicated, and tried to find out where he wanted to go, but Panor mumbled something which he could not understand. MacDonald says that when the Wilson avenue train, towards which Panor lurched, stopped, he tried to put Panor on that train but he did not want to get on; that after that train pulled out he tried to lead Panor down the exit, thinking he wanted to go to the street. MacDonald finally took him over and stood him up against the signboard on the platform, facing east, towards Anderson's store; practically carried him around the signboard; that Panor then had his back resting against the signboard and his head on one side. The signboard was located about the center of the platform and ran lengthwise. About that time, there was a Ravenswood train coming north on the east track which MacDonald intended to take. He recognized it by the red and white light it had. It had already left Wellington avenue station. As it approached MacDonald stood by Panor for a while and then left him and walked north to where the doors would ordinarily stop on the platform. When MacDonald got about six feet away from Panor, he turned around, and just as he did so, he saw Panor fall forward, "he took about one step and went over the platform" towards the east; fell head first onto the north-

bound railroad tracks.    At the time that train, a Ravenswood local, was about 40 feet away, MacDonald observed that the motorman put on his emergency brake, but the train did not come to a stop in time to avoid running over Panor.   MacDonald says the front trucks passed entirely over him.

There was another witness, Salisbury, for the plaintiff, who was standing on the platform when Panor and MacDonald (the latter being referred to by Salisbury as a young man in a sailor's uniform or the sailor) got off the northbound Evanston express train. Salisbury was a messenger employed by the Continental and Commercial National Bank.   He saw MacDonald step off the car first, supporting Panor.   He says that MacDonald "had a hold of one of his arms, half carrying him off the train that he was about to step off of."   For a few seconds he paid no particular attention to them and then looked again, after the train they had gotten off had started northward, and saw MacDonald still had hold of him; that the Wilson avenue train followed the Evanston train by about a minute and Panor staggered over towards the train as it was coming in and MacDonald yanked him away from the train, "over towards the direction" in which Salisbury was standing, that is east.   Salisbury says "he half carried him or half dragged him to the sign which was near to the entrance or exit leading to the street and they both stayed there"; that at that time Salisbury was within about fifteen feet of them to the south; that MacDonald "propped him (Panor) up against the sign alongside of the exit stairway leading down from the platform.   He had him leaning back so that the sign behind him supported him and his balance was even enough to hold him in the position he had been propped up in."   Salisbury says, further, that MacDonald then left Panor and walked in a northerly direction and that at the time a Ravenswood local was approaching from the south; that he,

Salisbury, proceeded to walk up north in readiness to get on the Ravenswood local which was pulling in; that Panor started at the same time, being fifteen or twenty feet ahead of him, and as Panor did so, he "gave a lurch and over he went." That at that particular second the train was probably not five feet from him.

The platform in question was the east platform of the Belmont avenue station, that station being a point of transfer to and from Ravenswood trains and also from express to local trains. The east platform is in the nature of an island platform, that is, located between two tracks, both these tracks being northbound. The express trains run on the track just west of the platform and the local trains on the track immediately east of the platform. The platform, according to the testimony of MacDonald, was about nine or ten feet wide. No platform man was on duty at that station at the time of the accident, no such employees being kept there after seven in the evening.

Evidence was introduced on behalf of the defendant which identified and described the different trains and their crews which passed Belmont avenue northbound on the night in question just prior to and at the time in question. Panor was killed, according to the motorman of the train which struck him, at 8:53 p. m.

On behalf of the defendant, all the employees of those trains which included the Evanston train which Panor traveled on, and from which he alighted, were called and testified, and each one of them stated that he saw no person who was intoxicated, or who in any way appeared to be so, getting on or off his particular train or on his train or on or about the platform at Belmont avenue, that night, and saw no one being assisted off the train or being assisted by anyone on the station platform.

The motorman of the Ravenswood train, which was the one that struck and killed Panor, stated that as his train was pulling into the Belmont avenue station

on the east track he saw Panor as he was falling from the station platform to the track; that when he fell the train was not more than five or six feet from him; that at once he applied his emergency brakes and did all he could to stop his train but could not stop it in time to avoid running over him.

The defendant, at the close of the plaintiff's case, made a motion to exclude the evidence from the jury on the ground of a variance between the allegations of the declaration and the proof, and, also, made a motion for a directed verdict at the close of the plaintiff's case. This latter motion was renewed at the close of all the evidence. The trial judge denied both motions. The jury returned a verdict in favor of the plaintiff and against the defendant, and assessed her damages at $3,500. A motion was made on behalf of the defendant for a new trial and in arrest of judgment. They were both overruled, and judgment was entered on the verdict. From that judgment this appeal was taken by the defendant.

Was the jury justified in finding the defendant negligent? Obviously the guard's failure to care for Panor offends one's natural sense of duty and justice. Panor's fall and death was not an accident as it could have been foreseen. The consequence of leaving him on the platform was not a concealed consequence, as, by an average reasonable man, it might have been expected. The guard, therefore, had a choice, he could leave Panor where he pushed him, to his fate and almost immediate destruction, or, knowing he was intoxicated and helpless, he could have taken charge of him after he was out on the platform and thus have saved his life. It follows, therefore, having had it within his power to avoid the death of a man, and having wittingly failed to exercise that power, he is not only morally but legally liable.

As has frequently happened in the law, that average conduct, which is ethical and would be expected of a

prudent man, has become the source of a rule of conduct, a violation of which entails legal liability for consequent injury.

In *Burke v. Chicago & N. W. Ry. Co.,* 108 Ill. App. 565, which came up on a demurrer to a declaration, which declaration recited that the servants of the defendant, knowing the plaintiff was so intoxicated that he was in a helpless condition and unable to form any intelligent purpose or to act in an intelligent manner, took him from a train and carelessly and negligently placed him on a platform between two railroad tracks and then undertook to switch cars along one of said railroad tracks so that the plaintiff, getting over near one of the tracks, was struck by one of the defendant's cars and seriously injured, the court said:

"In view of the plaintiff's helpless condition and inability to exercise his mental faculties for his own care alleged in the declaration, and of the knowledge of the defendant's servants of his condition, and of the fact that they were about to switch cars on the very track along which plaintiff must pass if he attempted to reach the street by the only route provided by the defendant, and over which walk and platform its cars, while being switched, would project, defendant and its servants owed plaintiff a further duty, the discharge of which would have prevented the injury, and the failure to discharge which duty ought not to be excused by the fact that his helpless and unintelligent condition was due to intoxication."

In that case the court also states that having accepted the plaintiff as a passenger and having knowledge of his condition, they were bound to put him "in some place of safety after removing him by force from the train, and that they had not completed the duty they owed to plaintiff when they deposited him upon the platform between two railroad tracks, one of which he must cross in leaving the railroad grounds, and on both of which tracks said servants were about to move cars from said train." It was further held in that

case that it was not necessary to allege in the declaration that he exercised care for his own personal safety.

In *O'Rourke v. Louisville & N. R. Co.*, 183 Ill. App. 593, the court held that a declaration which alleged that the defendant after having received a passenger, who it knew to be intoxicated and incapable of taking care of himself, allowed him to leave one of its cars and wander about upon the station platform and then over upon the tracks of another railroad where he was killed, stated a good cause of action. The court said in that case: "If plaintiff was, through intoxication, so bereft of reason that he was without intelligence to care for himself and while in that condition and known by defendant to be in that condition he was abandoned in a known place of danger where injury would be likely to result, such facts would constitute negligence."

In *Croom v. Chicago, M. & St. P. Ry. Co.*, 52 Minn. 296, the court said:

"But, if the company voluntarily accepts a person as a passenger, without an attendant, whose inability to care for himself is apparent or made known to its servants, and renders special care and assistance necessary, the company is negligent if such assistance is not afforded. In such a case it must exercise the degree of care commensurate with the responsibility which it has thus voluntarily assumed, and that care must be such as is reasonably necessary to insure the safety of the passenger, in view of his mental and physical condition. This is a duty required by law, as well as the dictates of humanity."

There are quite a number of decisions, in other jurisdictions, showing the general reasoning of the courts on similar situations of fact. In *Louisville, H. & St. L. Ry. Co. v. Gregory's Adm'r*, 141 Ky. 747, the court said: "It is the duty of the train employees to look after the safety and comfort of all the passengers, and they are not required to extend to one more protection or care than another, except under special cir-

174     APPELLATE COURTS OF ILLINOIS.

Panor v. Northwestern Elevated Railroad Co., 228 Ill. App. 162.

cumstances. * * * But when a passenger is so much
under the influence of liquor as to be helpless or ir-
responsible or incapable of protecting himself from
accident, and his condition is or could be known by
the trainmen in the exercise of reasonable care, the
plainest dictates of humanity demand that he should
not be permitted to remain or place himself in un-
necessary peril if the persons in charge of the train
by the exercise of reasonable care can prevent it."
In *Fagan v. Atlantic Coast Line R. Co.*, 220 N. Y. 301,
which was a case involving the death of an intoxicated
passenger, the court said, referring to the defendant
company: "The defendant was under the special
duty, with regard to the intestate by reason of his
insensible condition, known to the conductor, of exer-
cising such care, precaution and aid as were reason-
ably necessary for his safety, and of bestowing upon
him any special care and attention beyond that given
to the ordinary passenger which reasonable pru-
dence and care demanded for his exemption from in-
jury. The care which it was bound to exercise with
respect to his safety would have reference to his
known condition and the situation as a whole. The
fact that the condition was self-imposed does not miti-
gate the duty." Citing quite a large number of cases
from various jurisdictions.

In *Louisville & N. R. Co. v. Tuggle's Adm'r*, 151 Ky.
409, where an intoxicated passenger was put off a
train at night, the court said: "The negligence of
defendant consisted in its leaving Tuggle, if it did
so leave him, in a drunken and helpless condition, to
the knowledge of appellant's conductor and brakeman,
at a late hour of the night, in a strange place, upon
a railroad track and without anyone to take care of
him." *Louisville & N. R. Co. v. Ellis' Adm'r*, 97 Ky.
330.

In *Black v. New York, N. H. & H. R. Co.*, 193 Mass.
448, which involved injury to an intoxicated passenger,

that court undertook to state the reasons why voluntary intoxication may not prevent recovery for a defendant's negligence, and said:

"The defense rests principally upon the fact that the plaintiff was intoxicated, and was incapable of caring for himself after he was taken from the train, and therefore was not in the exercise of due care. If his voluntary intoxication was a direct and proximate cause of the injury, he cannot recover. The plaintiff contends that it was not a cause, but a mere condition, well known to the defendant's servants, and that their act was the direct and proximate cause of the injury, with which no other act or omission had any causal connection. The distinction here referred to is well recognized in law. Negligence of a plaintiff at the time of an injury caused by the negligence of another is no bar to his recovery from the other, unless it was a direct, contributing cause to the injury, as distinguished from a mere condition, in the absence of which the injury would not have occurred. * * *

"The application of this rule sometimes gives rise to difficult questions. But in this connection the doctrine has been established that, when the plaintiff's negligence or wrongdoing has placed his person or property in a dangerous situation which is beyond his immediate control, and the defendant, having full knowledge of the dangerous situation, and full opportunity, by the exercise of reasonable care, to avoid any injury, nevertheless causes an injury, he is liable for the injury. This is because the plaintiff's former negligence is only remotely connected with the accident, while the defendant's conduct is the sole, direct and proximate cause of it."

It will thus be seen that the great weight of authority supports the rule that where the servants of a carrier put a helplessly intoxicated passenger off on a dangerous platform, with knowledge of his condition, and leave him without further care, and he is thereby injured, it is liable for negligence.

Further, here, one of the guards of the Evanston train which left Kinzie street at 8:38 on the evening

in question testified that he had helped many people off trains, and if they were intoxicated and not able to go down he took them down stairs himself and put them off the company's property, that that was a rule of the company. He was corroborated by Dwyer, another guard. It is not unreasonable to conclude, therefore, that such a rule governing the conduct of the guard under those particular circumstances is a fair criterion as to the duty of the defendant company. *Weakley v. New York Cent. R. Co.,* 169 N. Y. App. Div. 870, 155 N. Y. Supp. 744. Considering all the circumstances we are of the opinion that the evidence sufficiently justified the jury in concluding that the defendant was negligent.

It is contended that the declaration is insufficient. It is claimed by the defendant that, although it has been held in the *O'Rourke* and *Burke* cases, *supra,* that one intoxicated to a condition of known helplessness is relieved of care for his own safety, it has never been actually so determined by the Supreme Court, and, further, that it is necessary for one who is injured while voluntarily intoxicated and as a result of such intoxication, to show that the actions of another, which contributed to the injury, were wilfully, or so grossly negligent, as to impute wilfulness. We have examined the cases cited by counsel upon that point but do not find that they support the above contention. We are of the opinion that it was not necessary to charge the defendant with wilful or wanton negligence.

The declaration does not contain any allegation that the deceased was in the exercise of due care for his own safety at the time in question. Of course, it has been announced time and again as a general rule that in a declaration in a suit to recover damages which are alleged to have been caused by the defendant's negligence, an allegation of due care on the part of the plaintiff is fundamentally essential. Further, it is

a commonly announced rule that the condition arising from voluntary intoxication does not excuse a failure to use that care which is to be reasonably expected of a sober person. In *South Chicago City Ry. Co. v. Dufresne,* 200 Ill. 456, which was a case where it was held that the evidence did not justify the jury in finding that the plaintiff was intoxicated, it was said. "The rule is that voluntary intoxication would not excuse a person from such care as may reasonably be expected from one who is sober." Likewise, in *Wilcke v. Henrotin,* 241 Ill. 169, where it was held that the clear preponderance of the evidence showed that the plaintiff was not intoxicated, the court said: "If defendant in error was intoxicated at the time of his injury, it neither bars his right to recover nor relieves him from the duty of exercising reasonable care for his own safety." That case cites the *Dufresne* case, *supra.*

In *Keeshan v. Elgin, A. & S. Traction Co.,* 229 Ill. 533, which came up on a demurrer to a declaration, in which it was alleged that the railroad company, on a cold and stormy night, put a passenger off, with violence, before he had reached his destination, which was five miles further on, knowing he was unable by reason of intoxication to care for himself, and left him there, and as a result he undertook to walk from the place at which he was put off to his home and in doing so fell through a bridge and was, as a result, killed, the court said: "His attempt to walk home across defendant's bridge has no apparent connection with his expulsion from the train"; in other words, the conduct of the company's employees was not the proximate cause of his death. The court further says: "The defendant cannot be held liable for failing to provide against a possible injury which could not have been reasonably anticipated."

In no case that we have been able to find has the Supreme Court had before it the direct question whether voluntary intoxication is in any way an ex-

cuse or condonation for lack of ordinary care. We are of the opinion that, as stated in the *Burke* case, *supra,* the allegations in voluntary intoxication cases, where they go so far as to set up complete helplessness, constitute an exception to the general rule. Here the deceased was a passenger on the defendant's railroad and his helpless condition was known to the guard who had charge of the defendant's train. The guard assisted in pushing him off on the island platform, then closed the gate of the train and the train went on; the deceased was then left in an entirely unprotected area in danger of a false step, and of being run over by any train that might come through.

Bearing in mind the serious obligation which the law places upon the carrier and that that obligation does not necessarily cease when the train arrives at a platform such as the one in the instant case, the carrier was bound "to exercise towards him the utmost care and intelligence in providing against those injuries which can be avoided by human foresight." *Gaynor v. Old Colony & N. Ry. Co.,* 100 Mass. 208. Considering the helpless condition of Panor, which was known to the guard, and all the other circumstances, in our opinion the general rule requiring an allegation of ordinary care is inapplicable.

It is contended that it was error to give the first instruction which was given on behalf of the plaintiff. That instruction is as follows:

"The court instructs the jury that the defendant was a common carrier of passengers and was required to do all that human care, foresight and prudence could reasonably do, consistent with the character and mode of conveyance employed and the practical operation of the road to prevent accidents to its passengers; and if the jury believe from the evidence that the plaintiff's intestate in this case was, at and prior to the time of the accident in question, a passenger of the defendant and in such a state of intoxication that he was unable to exercise care for his own safety and

that such condition of plaintiff's intestate, if he was in that condition, was known to the defendant and that the defendant then and there failed to exercise the highest degree of care, foresight and prudence consistent with the practical operation of its road and the character and mode of conveyance employed, for the safety of plaintiff's intestate and that as a direct result of such negligence of the defendant, if any, the plaintiff's intestate received the injury which caused his death, as alleged in the declaration, then you should find for the plaintiff.''

It is our judgment that the antecedent of the words ''as alleged in the declaration'' is all that has gone before, and, therefore, refers to whatever negligence was set up in the declaration. The instruction differs materially from that in *Herring v. Chicago & A. R. Co.,* 299 Ill. 214. In the latter case the words, ''as alleged in the declaration,'' preceded the words, ''through the negligence of the defendant,'' and, therefore, as the court said in that case, ''the negligence referred to was not limited to that charged in the declaration.'' It is further claimed that the foregoing instruction held the defendant to a higher degree of care than is warranted by any rule covering the duty of a carrier to a passenger. In *Chicago Terminal Transfer R. Co. v. Schmelling,* 197 Ill. 619, the court said: ''The duty of a carrier to its passengers is not only to exercise the highest degree of care and prudence in carrying them to their destinations, but also to afford them reasonable opportunities to leave the trains of the company with safety. * * * The relation of carrier and passenger does not terminate until the passenger has alighted from the train and left the place where passengers are discharged, and the duty of the carrier to its passenger continues until the passenger has had a reasonable time in which to leave the depot or alighting place.'' In that case the court quoted with approval from *Pennsylvania Co. v. McCaffrey,* 173 Ill. 169, the following: ''It is its duty,

180          APPELLATE COURTS OF ILLINOIS.

Panor v. Northwestern Elevated Railroad Co., 228 Ill. App. 162.

not only to exercise a high degree of care while the passenger is upon the train but also the highest degree of care and skill, reasonably practicable, in providing the passenger a safe passage from the train.'' In the *Burke* case, *supra,* the court said that common carriers were required to do all that human care, vigilance and foresight could reasonably do under the circumstances and consistent with the mode of conveyance employed for the safety of their passengers.

In the instant case the negligence complained of was lack of care for Panor whom the defendant knew to be incapable of taking care of himself. As to the construction or maintenance of its platforms, no charge of negligence is made. The evidence sufficiently shows that the defendant knew at the time it placed Panor on the station platform that he was so intoxicated as to be unable to take care of himself, and, yet, the guard who helped Panor off the train onto the platform, and reached out and pushed him away, did nothing further to help him. Under the circumstances, we are of the opinion that the defendant owed to the deceased the duty of exercising the highest degree of care consistent with the practical operation of the railroad, and that there was no error in the instruction which was given.

It is contended that the court erred in refusing to give an instruction which was offered by the defendant, the important part of which is as follows:

''That the deceased was wholly or partly assisted from said train by the witness MacDonald, and that the latter then took charge of him and led or assisted the deceased from the place he alighted to the place from which he fell; and if you further believe from the evidence that the act of the said witness MacDonald in taking charge of said deceased, if you believe he did, and in leading or assisting him to the place from where he fell and there leaving him, under all the facts and circumstances shown by the evidence, was the proximate cause of decedent's fall from said

platform, and death, then you will find that the defendant is not liable and that the plaintiff cannot recover.''

It does not seem conceivable that MacDonald, in taking hold of Panor and bolstering him up against the signboard, can be considered in any way the proximate cause of Panor's death. MacDonald was helping to do that which was the obligation of the guard. Even if it were reasonable to urge that MacDonald should have taken further care of Panor, as said in *Pullman Palace Car Co. v. Laack,* 143 Ill. 242: ''It is well settled that where the injury is the result of the negligence of the defendant and that of a third person, or of the defendant, and an inevitable accident or an inanimate thing has contributed with the negligence of the defendant to cause the injury, the plaintiff may recover, if the negligence of the defendant was an efficient cause to the injury.'' *North Chicago St. R. Co. v. Dudgeon,* 184 Ill. 477; *City of Joliet v. Shufeldt,* 144 Ill. 403; *St. Louis Bridge Co. v. Miller,* 138 Ill. 465. We do not think any error was committed in refusing the proffered instruction.

In conclusion we are of the opinion that the court did not err in overruling the defendant's motion in arrest of judgment or in the giving and refusing of instructions or in refusing to direct a verdict for the defendant.

Finding no error in the record the judgment is affirmed.

*Affirmed.*

THOMSON, P. J., and O'CONNOR, J., concur.