# Illinois Official Reports

## Appellate Court

***Daniel v. Chicago Transit Authority*, 2020 IL App (1st) 190479**

| | |
|---|---|
| Appellate Court Caption | FLOYD DANIEL, as Independent Administrator of the Estate of Corey Daniel, Deceased, Plaintiff-Appellant, v. THE CHICAGO TRANSIT AUTHORITY and DUANE FERRELL, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>No. 1-19-0479 |
| Filed | February 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2018-L-9289; the Hon. Patricia O'Brien Sheahan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Leslie J. Rosen, of Leslie J. Rosen Attorney at Law, P.C., of Chicago, and Robert J. Rooth, of Rooth Law Firm, of Evanston, for appellant.<br><br>Karen G. Seimetz, Stephen L. Wood, and Irina Y. Dmitrieva, of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    The instant appeal arises from the death of decedent Corey Daniel, a passenger on a Chicago Transit Authority (CTA) bus who died from prolonged alcohol toxicity. Plaintiff Floyd Daniel, the independent administrator of the decedent's estate, filed a wrongful-death and survival action against defendant CTA and its driver, defendant Duane Ferrell. Defendants filed a motion to dismiss the complaint, arguing that they did not owe a duty to the decedent, and the trial court granted the motion, dismissing the complaint with prejudice. Plaintiff appeals, and for the reasons that follow, we affirm.

¶ 2                                          BACKGROUND

¶ 3    On August 28, 2018, plaintiff filed a four-count complaint against defendants, arising from the death of the decedent while he was a passenger on a CTA bus; the complaint was amended on November 30, 2018, and it is the dismissal of the amended complaint that is at issue on appeal. The amended complaint alleged that Ferrell was the operator of a CTA bus boarded by the decedent at 2:52 a.m. on March 3, 2018. The complaint alleged that "on and after" the time that the decedent boarded the bus, Ferrell "was aware that Plaintiff's decedent *** was intoxicated and/or infirm and in a helpless condition and unable to care for himself so that the hazards of his travel were increased." The complaint alleged that Ferrell breached the duties owed to the decedent by:

> "(a) Carelessly and negligently failing to appropriately check the bus for passengers upon pulling into the terminal; or
>
> (b) Carelessly and negligently failing to call for emergency medical services for Plaintiff's decedent in a timely manner; or
>
> (c) Carelessly and negligently failing to follow the policies and procedures of his employer, CHICAGO TRANSIT AUTHORITY; or
>
> (d) Carelessly and negligently failing to check on the status of Plaintiff's decedent's medical condition in a timely manner; or
>
> (e) Carelessly and negligently failing to provide additional care to Plaintiff's decedent given his level of intoxication; or
>
> (f) Carelessly and negligently failing to take reasonable action to give Plaintiff's decedent first aid after it had become apparent that he was ill or injured; or
>
> (g) Carelessly and negligently failing to take reasonable action to care for Plaintiff's decedent until he could be cared for by others."

With respect to the CTA, the complaint additionally alleged that the CTA breached the duties owed to the decedent by:

> "(h) Carelessly and negligently failing to train its employees in how to provide additional care to passengers who are known to be intoxicated; or
>
> (i) Carelessly and negligently failing to adopt and/or promulgate appropriate policies and procedures regarding how its employees should provide additional care to passengers who are known to be intoxicated."

The complaint alleged that, as a result of defendants' negligence, the decedent "sustained the effects of prolonged alcohol toxicity," including pain and suffering prior to his death. The

complaint further alleged that the decedent left three sons as his next-of-kin, who sustained pecuniary damage, including the loss of society, love, and affection, after the decedent's death.

¶ 4    The complaint set forth four causes of action, all based on negligence, with two counts pursuant to the Survival Act (755 ILCS 5/27-6 (West 2016)) and two counts pursuant to the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2016)).

¶ 5    On January 2, 2019, the CTA filed a motion to dismiss the amended complaint pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2018)), arguing that defendants did not owe a duty to the decedent because the decedent never exhibited any signs of a medical emergency while on the bus, nor did he inform Ferrell that he needed medical attention.[1] The CTA further argued that the decedent's intoxication did not give rise to a duty on the part of defendants and that they did not owe the decedent a duty to assess his physical condition and obtain medical assistance for him without any sign that he was in distress and in need of medical attention. The CTA also claimed that none of the allegations in the amended complaint gave rise to a duty on the part of the CTA and that many of the allegations were conclusory and void of any factual support. Finally, the CTA claimed that imposing a duty on the CTA in such a case would be impractical and overly burdensome, as the function of the CTA was to provide public transportation, not to assess the medical condition and guarantee the personal safety of every passenger.

¶ 6    Attached to the CTA's motion to dismiss were two CDs containing video surveillance footage from the bus on which the decedent had been traveling, which the CTA claimed showed that the decedent had not exhibited any visible signs of distress and also showed that Ferrell had followed the CTA's policies in dealing with the decedent. The CDs were included in the record on appeal, and our description of the contents of the videos is based on our own observations, not those of either party.

¶ 7    The videos, which have no audio, begin at 2:50 a.m. on March 3, 2018. At 2:52 a.m., the decedent enters the bus, walks past the farebox without stopping, and sits down in the second row of seats, directly behind a baby stroller. Between 2:53 a.m. and 2:58 a.m., the decedent appears to engage in conversation with a couple sitting in front of him and drinks three times from a bottle he is holding. The decedent also pours from his bottle into the cup of the man with whom he is conversing. At 2:58 a.m., the decedent stands up, walks to the front of the bus, takes another drink from the bottle, appears to look back at the bus driver, stands in the doorway of the bus, and throws the bottle out the door; the bus is not moving at the time. At 2:59 a.m., the decedent turns as though to go back to his seat but stops and appears to converse with the bus driver; the decedent is swaying as he is standing before the bus driver. The decedent pulls out his cell phone and spends time looking at it. At 3 a.m., the couple with whom the decedent had been conversing come to the front of the bus, and the woman has a conversation with the bus driver. At the end of the conversation, the woman indicates to the decedent that he should proceed toward the bus seats. The decedent moves to sit behind the couple again and appears to converse with them for a few minutes as the bus begins to move along its route. At approximately 3:04 a.m., the decedent leans back in his seat and over the next few minutes gradually slumps further down in the seat until, at 3:12 a.m., he is shown laying across two seats with his legs protruding across the aisle. The decedent is largely

_____

[1]Ferrell adopted the CTA's motion to dismiss on February 19, 2019.

motionless during the next few minutes, and as passengers enter the bus, they step over the decedent's legs.

¶ 8    The decedent appears to briefly rouse at 3:25 a.m., when the passenger seated across from him rises from his seat, and the woman in front of him appears to address the decedent and pats his leg several times. The woman again pats the decedent's leg at 3:29 a.m., but the decedent only moves slightly in response. The woman pats the decedent's leg a third time at 3:30 a.m., and the decedent again moves only slightly. At 3:30 a.m., the couple stand up and, at 3:31 a.m., the male in the couple reaches into the decedent's pocket and removes something. The woman exits the bus with the baby stroller from the front, while the man exits the bus from the rear. Another passenger appears to observe the event and, immediately after the couple exits the bus, pulls the cord to request the next stop. The passenger then stands and moves to the front of the bus and appears to briefly converse with the bus driver before exiting the bus at the next stop.

¶ 9    At 3:35 a.m., the bus makes its final stop. The bus driver speaks, then cups his hands around his mouth and speaks again. Approximately five seconds later, the bus driver speaks again, more animatedly. Approximately 20 seconds after the last time the bus driver speaks, a passenger rises from the back of the bus and exits through the rear door. Once that passenger leaves, the bus driver closes the bus doors and drives away; the decedent remains on board, laying across the seats.

¶ 10    At 3:37 a.m., the bus parks at the bus terminal, and the bus driver leaves his seat. He looks toward the back of the bus, then leaves the bus, leaving the bus doors open. The bus driver walks away toward a nearby building, which he enters at approximately 3:38 a.m. He remains in the building for approximately 52 seconds, then leaves the building and walks back toward the bus. At 3:39 a.m., the bus driver appears to make a phone call, continuing to walk toward the bus while on the phone. The phone call appears to last approximately 35 seconds and, by the end of the phone call, the driver is standing at the front of the bus, looking inside. The bus driver continues to look inside the bus for the next several minutes; the decedent is largely motionless but moves slightly several times. At 3:45 a.m., the bus driver walks several feet from the bus and looks around, primarily looking down the road; there appear to be occasional vehicles traveling down a road in the distance, including flashing lights. The bus driver remains in that position for nearly five minutes until, at 3:51 a.m., he appears to receive a phone call, which lasts approximately 12 seconds. At 3:53 a.m., two police vehicles arrive at the bus. A total of four officers enter the bus and attempt to physically rouse the decedent, and they obtain no response. In their efforts, the decedent slips off the seats, laying on the floor at the foot of the seats. While three officers are with the decedent, the fourth officer converses with the bus driver. The officers leave the decedent at 3:56 a.m., and most of the officers leave the scene at 3:57 a.m., leaving two officers standing just inside the entrance to the bus. One officer appears to engage in conversation with the bus driver. At 3:58 a.m., an officer walks down the aisle to look at the decedent, then returns to the front of the bus, where the two officers again converse with the bus driver. An ambulance arrives at the scene at 4:02 a.m., and two paramedics place the decedent into the aisle and begin examining him at 4:04 a.m. They then move him toward the front of the bus, where there is more space, and begin resuscitation efforts. Another ambulance arrives at 4:14 a.m., with three additional paramedics joining the resuscitation efforts. The paramedics cease resuscitation efforts at 4:32 a.m. The decedent is removed from

the bus at 4:35 a.m. and placed in an ambulance, which is still at the scene when the videos end at 4:37 a.m.

¶ 11 In response to the CTA's motion to dismiss, plaintiff claimed that the amended complaint properly stated causes of action for each count of the complaint. Plaintiff also argued that the videos submitted by the CTA were not authenticated by affidavit[2] and were not the type of affirmative matter that could be considered at the pleading stage. Plaintiff further claimed that if the court was to consider the videos, they—in addition to Chicago Police Department and fire department records—supported the allegations of the amended complaint.

¶ 12 Attached to the response were three exhibits. First, an incident report from the Chicago Police Department indicated that the police arrived at the scene at 3:55 a.m. on March 3, 2018.[3] The narrative in the report provided that, upon arrival, Ferrell "related that [the decedent] was unconscious and laying over the seats." The responding officer attempted to regain the decedent's consciousness and called for further medical assistance. A supplemental report indicated that the medical examiner performed an autopsy and determined the decedent's cause of death was "Acute Ethanol Toxicity."

¶ 13 Second, an incident report from the Chicago Fire Department indicated that an ambulance was dispatched for a "sick person" at 3:56 a.m. on March 3, 2018, arriving at the scene at 4:05 a.m. Upon arrival, the decedent was laying on the floor of a CTA bus between seats, unresponsive. The ambulance crew moved him to a location on the bus with more room and attempted to resuscitate him, without success. The report indicated that Ferrell stated that he had last observed the decedent talking to someone approximately 30 minutes prior to the crew's arrival and that the decedent "appeared intoxicated" when he was on the bus. The decedent was pronounced dead at the scene.

¶ 14 Finally, attached to the response was the CTA's bus system rule book. Section B2 of the rule book concerned "Dealing With Passengers." Section B2.5 concerned assisting passengers, with section B2.5.2 providing: "In case a passenger is ill or injured, the controller must be notified and the controller will determine what action should be taken. Employees must not leave ill or injured passengers alone." Section B2.10 concerned passengers asleep on buses at terminals and provided: "Employees observing passengers asleep on buses at terminals should attempt to arouse them and may call the controller for police assistance if required."

¶ 15 On February 28, 2019, the trial court entered an order granting the motion to dismiss with prejudice for the reasons set forth by defendants. In the order, the trial court noted that "all exhibits attached to the motion, response and reply were considered by the court and are a part of the record in this matter." This appeal follows.

---

[2]We note that, in its reply in support of its motion to dismiss, the CTA claimed that its videos were properly considered under the "silent witness" theory but, in the event that the court found it necessary to have an affidavit to authenticate the videos, also submitted the affidavit of the CTA's video specialist. It is not clear whether the trial court found that the affidavit was necessary, but its order granting the motion to dismiss indicated that "all exhibits attached to the motion, response and reply were considered by the court and are a part of the record in this matter."

[3]As noted, the time stamp of the video shows the police arriving at 3:53 a.m.

¶ 17    On appeal, plaintiff claims that the trial court erred in granting the motion to dismiss. A motion to dismiss under section 2-619 admits the legal sufficiency of all well-pleaded facts but allows for the dismissal of claims barred by an affirmative matter defeating those claims or avoiding their legal effect. *Janda v. United States Cellular Corp.*, 2011 IL App (1st) 103552, ¶ 83 (citing *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006)). When reviewing a motion to dismiss under section 2-619, "a court must accept as true all well-pleaded facts in plaintiffs' complaint and all inferences that can reasonably be drawn in plaintiffs' favor." *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). Additionally, a cause of action should not be dismissed under section 2-619 unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to relief. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 277-78 (2003). For a section 2-619 dismissal, our standard of review is *de novo*. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006); *Morr-Fitz, Inc.*, 231 Ill. 2d at 488. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Pranno Donkle v. Lind*, 2018 IL App (1st) 171915, ¶ 29. Additionally, even if the trial court dismissed on an improper ground, a reviewing court may affirm the dismissal if the record supports a proper ground for dismissal. See *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 261 (2004) (when reviewing a section 2-619 dismissal, we can affirm "on any basis present in the record"); *In re Marriage of Gary*, 384 Ill. App. 3d 979, 987 (2008) ("we may affirm on any basis supported by the record, regardless of whether the trial court based its decision on the proper ground").

¶ 18    As noted, "[a] motion for involuntary dismissal under section 2-619 admits the legal sufficiency of the plaintiff's claim but asserts 'affirmative matter' outside of the pleading that defeats the claim."[4] *Czarobski v. Lata*, 227 Ill. 2d 364, 369 (2008). "Affirmative matter may be 'something in the nature of a defense that completely negates the cause of action or refutes crucial conclusions of law or conclusions of material fact contained in, or inferred from the complaint.' " *Harris v. Vitale*, 2014 IL App (1st) 123514, ¶ 23 (quoting *Golden v. Mullen*, 295 Ill. App. 3d 865, 869 (1997)). In the case at bar, the "affirmative matter" asserted by defendants was their claim of lack of a duty, which is an appropriate subject for a section 2-619 motion. See *Anderson v. Chicago Transit Authority*, 2019 IL App (1st) 181564, ¶ 24 ("The question of whether defendant owed decedent a duty of care is a legal question also commanding *de novo* review and is an appropriate basis for a section 2-619 motion."); *Buckner v. O'Brien*, 287 Ill. App. 3d 173, 177 (1997) (finding that a section 2-619 motion was properly granted because

_____

[4]We note that neither party raises any issues on appeal with respect to the exhibits attached to the motion to dismiss, response, or reply, all of which were expressly considered by the trial court. While, in his response to the motion to dismiss, plaintiff had argued that the videos should not be considered, the CTA subsequently attached to its reply an affidavit of the CTA's video specialist, thereby authenticating the videos, and plaintiff does not renew this argument on appeal. Moreover, at least one court has considered such videos in reviewing a section 2-619 motion to dismiss. See *Anderson*, 2019 IL App (1st) 181564, ¶ 30. Additionally, while police reports are generally not admissible evidence (see *Horace Mann Insurance Co. v. Brown*, 236 Ill. App. 3d 456, 462 (1992)), at least one court has considered such a report in reviewing a motion to dismiss under section 2-619. See *Gilmore v. City of Zion*, 237 Ill. App. 3d 744, 748 (1992). Since the parties do not challenge the trial court's consideration of these documents, we have no need to determine whether they were properly considered by the trial court and also consider them in our analysis where applicable.

allegations in complaint were "negated and defeated by the affirmative matter [contained in an affidavit] that [the affiant] was not plaintiff's employer and had no authority to hire or discharge plaintiff"); *Milz v. M.J. Meadows, Inc.*, 234 Ill. App. 3d 281, 287 (1992) ("Whether a duty exists is a question of law to be determined by the court [citation], and the nonexistence of a duty may be the basis for a section 2-619 motion to dismiss [citations]."); *Wood v. Village of Grayslake*, 229 Ill. App. 3d 343, 349 (1992) ("The issue of whether the defendant owed plaintiff a duty of care is a question of law to be determined by the trial court which is properly asserted in a motion to dismiss pursuant to section 2-619.").

¶ 19    To state a cause of action for negligence, a complaint must allege facts that establish (1) the existence of a duty of care owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) an injury proximately caused by that breach. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006). Whether a defendant breached its duty and whether the breach was the proximate cause of the plaintiff's injuries are factual matters for a fact finder to decide. *Marshall*, 222 Ill. 2d at 430. However, whether a duty exists is a question of law for the court to decide. *Marshall*, 222 Ill. 2d at 430. Thus, if defendants owed no duty to the decedent, decedent's claims fail as a matter of law. See *Sheffer v. Springfield Airport Authority*, 261 Ill. App. 3d 151, 152-53 (1994) ("There can be no recovery in tort for negligence unless the defendant has breached a duty owed to the plaintiff.").

¶ 20    Our supreme court has made it clear that "[t]he touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Marshall*, 222 Ill. 2d at 436. In considering this question, courts often examine four factors: "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant." *Marshall*, 222 Ill. 2d at 436-37.

¶ 21    Additionally, our supreme court "has long held that a common carrier has a duty to its passengers to exercise the highest degree of care, not only to carry them safely to their destinations, but to provide them with a reasonable opportunity to leave the conveyance safely." *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 226 (2010). "Due to the unique control it possesses over its passengers' safety, a common carrier owes its passengers the highest duty of care consistent with the practical operation of its conveyances." *Sheffer*, 261 Ill. App. 3d at 154. The CTA does not dispute that it is a common carrier or that the decedent was a passenger on its bus. Accordingly, the CTA had a duty to exercise the highest degree of care with respect to the decedent. The question we must consider on this appeal is whether this duty extended to providing the decedent with medical care or otherwise checking on his condition at the end of the bus ride.

¶ 22    In the case at bar, plaintiff claims that he properly alleged that defendants had a duty to prevent injuries that could have been reasonably foreseen and avoided by defendants and that defendants had actual notice that a danger existed with respect to the decedent. Specifically, in his complaint, plaintiff alleged that defendants owed the decedent "a duty to exercise the highest duty of care to provide for his safety." Plaintiff points to his allegation that Ferrell "was aware that Plaintiff's decedent *** was intoxicated and/or infirm and in a helpless condition and unable to care for himself so that the hazards of his travel were increased," suggesting that this allegation was sufficient to give rise to a duty of care on the part of the CTA that included checking the status of the decedent's condition and providing medical care to the decedent.

- 7 -

¶ 23    It has long been the case that mere intoxication of a passenger does not give rise to a duty on the part of a common carrier to stand guard over that passenger but that, where the common carrier is aware of the intoxication, the carrier has a duty to take care that the passenger is not exposed to a risk of unreasonable harm. See, *e.g.*, *St. Louis, Alton & Terre Haute R.R. Co. v. Carr*, 47 Ill. App. 353, 358-59 (1892) (finding that the law does not impose a duty on the common carrier to guard over an intoxicated passenger, but it is liable if it knows that the passenger has placed himself in a perilous position); *Burke v. Chicago & Northwestern R.R. Co.*, 108 Ill. App. 565, 578 (1902) (finding that railroad owed a duty to intoxicated passenger who was deposited upon a platform between railroad tracks); *O'Rourke v. Louisville & Nashville R.R. Co.*, 183 Ill. App. 593, 595-96 (1913) ("If plaintiff was, through intoxication, so bereft of reason that he was without intelligence to care for himself and while in that condition and known by defendant to be in that condition he was abandoned in a known place of danger where injury would be likely to result, such facts would constitute negligence."); *Panor v. Northwestern Elevated R.R. Co.*, 228 Ill. App. 162, 175 (1923) ("[W]here the servants of a carrier put a helplessly intoxicated passenger off on a dangerous platform, with knowledge of his condition, and leave him without further care, and he is thereby injured, it is liable for negligence.").

¶ 24    In the case at bar, plaintiff claims that he is not arguing that the decedent's intoxication, in and of itself, gave rise to a duty on the part of defendants. Instead, he claims that he alleged in the amended complaint that the decedent was "intoxicated and/or infirm and in a helpless condition and unable to care for himself so that the hazards of his travel were increased" and suggests that this is different from merely alleging that the decedent was intoxicated. However, plaintiff's argument attempts to conflate several distinct concepts, and we do not find it persuasive.

¶ 25    First, with respect to the decedent's intoxication, as noted by the authorities cited above, if the intoxication left the decedent in a helpless condition such that the hazards of his travel were increased, the CTA would have a duty to use reasonable care that he was not exposed to a risk of unreasonable harm. See also Illinois Pattern Jury Instructions, Civil, No. 100.08 (2011) (hereinafter IPI Civil (2011)) ("When a carrier is aware that a passenger is intoxicated so that the hazards of travel are increased as to him, it is the duty of the carrier to provide that additional care which the circumstances reasonably require. The failure of the defendant to fulfill this duty is negligence."). However, in the case at bar, there is no allegation that any "hazards of travel" were responsible for the decedent's death or that the decedent was even exposed to any such hazards of travel. The decedent did not die as a result of entering or exiting the bus, by the movement of the bus on its route, or by being left in a dangerous location. The decedent died as a result of prolonged alcohol toxicity in his body, a cause wholly unrelated to the operation of the bus. In all probability, he would have died if he had been at home in his bed. Thus, we cannot find that the complaint alleged any additional duty on the part of defendants arising from the decedent's intoxication, nor can we find that the CTA and/or its driver participated in any manner in the death of the decedent.

¶ 26    We are not persuaded by plaintiff's contention that a fact finder could find that the decedent had placed himself in a position of danger by boarding a CTA bus while intoxicated and unable to care for himself. Plaintiff provides no support for the proposition that using public transportation while intoxicated automatically places the intoxicated passenger in a position of danger, and we cannot find this argument persuasive. If we did, then the CTA would have the

burden of calling an ambulance whenever a person appears to be under the influence of liquor or drugs. Accepting plaintiff's argument would transform the common carrier's duty to one of continual oversight of any intoxicated passengers, which is not and has never been the law.

¶ 27     Next, plaintiff's complaint included an allegation that the decedent was "intoxicated *and/or infirm* and in a helpless condition and unable to care for himself so that the hazards of his travel were increased." (Emphasis added.) The law concerning ill passengers is similar to that of intoxicated passengers—where the common carrier is aware of the illness, it has a duty to protect them from an unreasonable risk of danger. See IPI Civil (2011) No. 100.08 (using the same instruction for "Disabled, Infirm, Or Intoxicated Person[s]"); see also IPI Civil (2011) No. 100.08, Comment ("[w]hen a common carrier has actual knowledge that a person is suffering from some physical or mental disability, and further realizes that that person is in an unsafe place or cannot safely alight from its conveyance, the carrier owes him a duty to provide the additional care which his circumstances reasonably require").

¶ 28     Similarly, section 314A of the Restatement (Second) of Torts imposes a duty for a common carrier "to take reasonable action (a) to protect [its passengers] against unreasonable risk of physical harm, and (b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others." Restatement (Second) of Torts § 314A (1965).

¶ 29     However, in order for the common carrier's duty to arise, the common carrier must *know* of the infirmity. *Anderson*, 2019 IL App (1st) 181564, ¶ 39 ("A common carrier is not liable when he lacks knowledge of an unreasonable risk, illness, or injury."); see also IPI Civil (2011) No. 100.00, Introduction ("This duty arises only when the carrier has actual notice of a danger or notice of facts and circumstances that a danger probably exists. The carrier's knowledge is a prerequisite to the imposition of the duty of the highest degree of care." (citing *Anderson v. Yellow Cab Co.*, 28 Ill. App. 3d 656 (1975))).

¶ 30     In the case at bar, plaintiff's allegation conflates knowledge of the decedent's intoxication with knowledge of the decedent's illness. Even if Ferrell was aware of the decedent's intoxication, however, it does not follow that he would have been aware that the decedent was in the process of dying from alcohol toxicity. Plaintiff's complaint does not set forth any allegations explaining how Ferrell would have known that the decedent was ill. Furthermore, the videos show that the decedent was laying on the bus quietly for much of his ride; the decedent boarded the bus at 2:50 a.m. and, by 3:12 a.m., was laying on the seats, where he remained until the police arrived at 3:53 a.m. The decedent did not make any movements or otherwise show visible signs of distress such that Ferrell would have been expected to know that he was suffering a medical emergency, and plaintiff does not claim that he made such movements. In the absence of any factual allegations demonstrating Ferrell's knowledge of the decedent's medical condition, we cannot find that defendants owed the decedent a duty to care for him or protect him from any hazards arising from his condition.

¶ 31     Plaintiff claims that the determination of whether defendants had notice of the decedent's intoxication or illness are questions of fact inappropriate for resolution on a motion to dismiss. However, Illinois is a fact-pleading jurisdiction, and a plaintiff must allege facts sufficient to bring a claim within a legally recognized cause of action, not simply conclusions. *Marshall*, 222 Ill. 2d at 429-30. "Well-pled facts are specific allegations of fact that bring a complaint within a recognized cause of action; mere conclusory allegations unsupported by specific facts will not suffice." *Primax Recoveries, Inc. v. Atherton*, 365 Ill. App. 3d 1007, 1010 (2006)

(citing *County of Cook v. City of Chicago*, 229 Ill. App. 3d 173, 175-76 (1992)). The only "fact" pled by plaintiff concerning notice is the conclusory allegation that Ferrell "was aware that Plaintiff's decedent *** was intoxicated and/or infirm and in a helpless condition and unable to care for himself so that the hazards of his travel were increased." This allegation is a conclusion, not a fact, and we cannot find that it suffices even for purposes of a motion to dismiss, especially in light of the videos providing an objective depiction of the decedent's behavior while on the bus.

¶ 32    We are similarly unpersuaded by plaintiff's claim that the police and fire department reports show that Ferrell was aware that the decedent was in the midst of a medical emergency. Plaintiff makes much of the fact that the police report stated that Ferrell "related that [the decedent] was unconscious and laying over the seats." However, the use of the word "unconscious" is not synonymous with "suffering a medical emergency." It simply means "not conscious." Cambridge Dictionary, http://dictionary.cambridge.org/us/dictionary/English/unconscious (last visited Feb. 18, 2020) [https://perma.cc/C55V-RJG7]. A person may appear to be "unconscious" when they are merely asleep. Additionally, the use of the word in the police officer's summary, which is not surrounded by quotation marks, does not indicate that this was the same language used by Ferrell; in another area of the reports, a detective says that the decedent was "found on [the bus] by CTA Bus Operator FERRELL, Duane to be unresponsive laying across seats at end of route. FERRELL had CTA dispatch, call 911 and Beat 422R responded and attempted to wake, the unresponsive victim." Thus, the terminology used in the police report does not support plaintiff's claim that Ferrell was aware of the decedent's medical emergency, and we find plaintiff's argument otherwise to be unpersuasive.

¶ 33    Our decision is consistent with the recent *Anderson* case, decided during the pendency of the instant appeal. In that case, the decedent was standing on an "L" platform, where he remained for approximately 30 minutes while a number of trains passed him. *Anderson*, 2019 IL App (1st) 181564, ¶ 4. The decedent wandered across the platform, sometimes stumbling or wobbling. *Anderson*, 2019 IL App (1st) 181564, ¶ 4. The decedent dropped a bottle or can onto the platform, where he stepped or tripped on it, falling onto the electrified third rail and causing him to be electrocuted. *Anderson*, 2019 IL App (1st) 181564, ¶ 7. The plaintiff filed suit against the CTA, claiming that the decedent had been suffering from a medical emergency due to diabetes and that the CTA owed the decedent the " 'highest duty of care,' " which it breached by, *inter alia*, failing to approach the decedent to assess his medical condition or to summon medical assistance. *Anderson*, 2019 IL App (1st) 181564, ¶ 9.

¶ 34    The *Anderson* court first found that the heightened duty owed by a common carrier did not apply because the decedent was not a passenger at the time. *Anderson*, 2019 IL App (1st) 181564, ¶ 30. Additionally, the court found that there was no "competent evidence" that the CTA had notice of the decedent being in the midst of a medical emergency. *Anderson*, 2019 IL App (1st) 181564, ¶ 39. The court noted that the video contradicted the plaintiff's allegations that CTA employees even observed the decedent or his activities. *Anderson*, 2019 IL App (1st) 181564, ¶ 40. Finally, the court pointed to the fact that multiple passengers also passed by the decedent without taking any action, indicating that the decedent's conduct was not aberrant. *Anderson*, 2019 IL App (1st) 181564, ¶ 40. The court noted that

> "indeed, there is no reason why anyone should have taken note of decedent's somewhat erratic activity. To state the obvious, the bus station and train platforms of Chicago have plenty of people who are not acting in an entirely normal way, so decedent's

- 10 -

behavior, even if specifically observed, would not look that out-of-place at an 'L' station. Even considered with the improved vision of hindsight, the decedent gave all appearances of nothing more than a commonly observed mass transit platform habitué." *Anderson*, 2019 IL App (1st) 181564, ¶ 40.

¶ 35 Similarly, in the case at bar, as noted, there was no indication that the decedent was in the midst of a medical emergency. Plaintiff alleges only that Ferrell "was aware that Plaintiff's decedent *** was intoxicated and/or infirm and in a helpless condition and unable to care for himself so that the hazards of his travel were increased." He does not provide any factual allegations as to the source of Ferrell's knowledge as to the decedent's medical condition. By contrast, the videos show that the decedent was not exhibiting any signs of distress but was laying rather quietly on the seats for the majority of his time on the bus. Accordingly, we cannot find that the trial court erred in dismissing plaintiff's complaint based on a lack of duty.

¶ 36 CONCLUSION

¶ 37 For the reasons set forth above, plaintiff's complaint was properly dismissed because defendants did not owe the decedent a duty arising out of his intoxication and death by prolonged alcohol toxicity.

¶ 38 Affirmed.